UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
RAMEL SANDERS,

                                                 **FIRST AMENDED
COMPLAINT**

                                                 **13 CV 257 (SAS)
ECF Case**

                    Plaintiff,

           vs.

The CITY OF NEW YORK, POLICE OFFICER
GEORGE ANNARELLA, Shield # 13728
SERGEANT DAVID MCQUEEN, Shield # 2904      **JURY TRIAL DEMANDED**
And DETECTIVE MICHAEL HAVERTY, Shield # 842
in their individual and official capacities,

                    Defendants.
--------------------------------------------------------x

Plaintiff Ramel Sanders, by his attorney, Cyrus Joubin, complaining of the Defendants,

respectfully alleges as follows:

## PRELIMINARY STATEMENT

    1.    This civil rights action arises from the arrest and prosecution of Ramel

Sanders ("Plaintiff") on the false and fabricated grounds that he perpetrated identity theft,

grand larceny, and other related crimes.  Plaintiff asserts constitutional claims pursuant to

42 U.S.C. § 1983 ("Section 1983") against the individual defendants for unreasonable

search and seizure, false arrest and imprisonment, malicious prosecution, and failure to

intervene, and a *Monell* claim against the City of New York for the same constitutional

violations.  Additionally, Plaintiff asserts analogous claims under New York Law against

the individual defendants, and against the City of New York under the doctrine of

*respondeat superior*.  Plaintiff seeks compensatory and punitive damages, costs,

disbursements, and attorney's fees pursuant to applicable state and federal civil rights law.

## JURISDICTION

2.     This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 and the Fourth Amendment to the United States Constitution.  Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343 (a)(3) and (4), this being an action seeking redress for the violation of Plaintiff's constitutional and civil rights.

3.     Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all state law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy which gives rise to the federally based claims and causes of action.

## VENUE

4.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because the acts complained of occurred in this district and Plaintiff resides in this district.

## JURY DEMAND

5.     Plaintiff respectfully demands a trial by jury on each and every one of his claims as pled herein, pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

6.     Plaintiff Ramel Sanders is an African-American male, a citizen of the United States, and at all relevant times a resident of the City of New York, State of New York.

7.     The individually named defendants Police Officer George Annarella (Shield # 13728), Sergeant David McQueen (Shield # 2904), and Detective Michael Haverty (Shield # 842) (collectively, the "individual defendants") are and were at all times

relevant herein officers, employees and agents of the New York City Police Department ("NYPD").

8.    Upon information and belief, on the date of the incident giving rise to this complaint, the individual defendants were assigned to the 23rd Precinct in Manhattan.

9.    Each individual defendant is sued in his individual and official capacity.  At all times mentioned herein, each individual defendant acted under the color of state law, in the capacity of an officer, employee, and agent of defendant City of New York ("Defendant City").

10.    Defendant City is a municipality created and authorized under the laws of New York State.  It is authorized by law to maintain, direct, and to supervise the NYPD, which acts as its law enforcement agent and for which it is ultimately responsible.

## NOTICE OF CLAIM

11.    Plaintiff served a Notice of Claim on the Comptroller of the City of New York within ninety days of the incident.  At least 30 days have elapsed since the service of the Notice of Claim, and adjustment and payment has been neglected or refused.

12.    The City of New York demanded a hearing pursuant to General Municipal Law § 50-h, which hearing was held on April 25, 2012.

13.    This action has been commenced within one year and ninety days after the occurrence of the event upon which the claims are based.

## STATEMENT OF FACTS

14.    On November 2, 2011, between 1:20 PM and 2:33 PM, an unknown man (the "Swindler") went into three JP Morgan Chase Bank ("Chase") branches in Brooklyn, New York, and fraudulently withdrew $10,900 from a Chase customer's account. Numerous surveillance cameras in each of the three Chase banks captured images from

various angles of the Swindler as he committed grand larceny and identity theft, among other felonies.

15.     Plaintiff Ramel Sanders is not the Swindler.

16.     While the Swindler was making fraudulent transactions in Brooklyn, Plaintiff was in another state, over twenty miles away.

17.     On November 2, 2011, at around 2:00 PM, Plaintiff was in the Municipal Court of Englewood, New Jersey to resolve a parking ticket.  He received this parking ticket on October 22, 2011, while his fiancée was in a hospital giving birth to their second child, because he had improperly parked their car outside the hospital.  This ticket (#032898) had a Notice to Appear with a court date of November 2, 2011, at 2:15 PM.

18.     While inside the Municipal Court of Englewood, Plaintiff ran into Coletia Smith, a friend of his fiancée, and they spoke for several minutes.  When the lunch break ended at around 2:15 PM, Plaintiff spoke to a clerk and tried to contest the parking ticket. Afterward, Plaintiff left the court and drove to his apartment on East 128th Street in Manhattan.

19.     That evening, at around 8:00 PM, Plaintiff gave his friend Courtney Miles ("Mr. Miles") the keys to his rental car, a Nissan Altima (the "Nissan"), which Plaintiff had been renting since October 31, 2011, and which Mr. Miles had asked to borrow. Plaintiff did not know why Mr. Miles needed the car.

20.     After giving the Nissan to Mr. Miles, Plaintiff went home.

21.     After taking the Nissan, Mr. Miles joined up with two acquaintances, Dwayne Jones ("Mr. Jones") and Justin Isaacs ("Mr. Isaacs").

22.     Mr. Miles, Mr. Jones, and Mr. Isaacs were in the Nissan – with Mr. Miles driving – when NYPD officers approached the car, detaining the men inside.

23.     Mr. Miles, Mr. Jones, and Mr. Isaacs were placed under arrest because they possessed identity documents belonging to other individuals.

24.     Mr. Miles unlawfully possessed a stolen credit card and personal identification information.

25.     There were no identity-fraud-related documents in the Nissan besides those found on the persons of Mr. Miles, Mr. Jones, and Mr. Isaacs.

26.     At around 10:00 PM, Plaintiff received a phone call from defendant Police Officer George Annarella, who informed him that Mr. Miles was in police custody for driving the Nissan without the proper paperwork.  When Plaintiff said that he had the rental contract for the Nissan, Officer Annarella told Plaintiff to bring that contract to the 23rd Precinct, at 162 East 102 Street in Manhattan.

27.     Immediately after this conversation, Plaintiff went to the 23rd Precinct, where he handed the rental contract to Officer Annarella.  Annarella asked for Plaintiff's driver's license as well, and Plaintiff gave it to him.  Annarella then went upstairs.

28.     Plaintiff sat waiting in the lobby of the 23rd Precinct until around 2:00 AM, at which point Officer Annarella came back to the lobby and returned Plaintiff's driver's license.  Plaintiff asked for the return of the Nissan, but Officer Annarella said that Plaintiff could not get the car back that night.

29.     The next day, November 3, 2011, Plaintiff, knowing he was financially liable for the Nissan under his rental contract, sought to get back the Nissan.

30.     At around 11:00 AM, Plaintiff called the 23rd Precinct and spoke to Officer Annarella, who informed him that only an employee from the car-rental company was authorized to pick up the Nissan.

31.     Plaintiff then called the company from which he rented the Nissan, All-Car-Rent-a-Car, located in the Bronx.  He spoke to Charise Parks ("Ms. Parks"), an employee, who was also in the process of trying to get the Nissan back.

32.     At around 6:00 PM, Plaintiff received a phone call from Ms. Parks, who instructed him to go to the 23rd Precinct to retrieve the Nissan; she said that Officer Annarella told her that Plaintiff could pick up the Nissan.

33.     At around 6:30 PM, Plaintiff walked into the 23rd Precinct and gave his name to the desk officer.  Soon after, with no explanation, Officer Annarella, along with a group of police officers, approached Plaintiff and placed him under arrest, handcuffing him behind his back, and frisking him.

34.     The officers took Plaintiff upstairs and led him into an interrogation room.

35.     Inside the interrogation room, over the course of about three hours, Plaintiff was questioned by Officer Annarella and Detective Haverty.

36.     With no evidence that Plaintiff was guilty of any offense, baselessly assuming that Plaintiff's acquaintance with Mr. Miles was nefarious, Annarella and Haverty went on a wild-goose chase looking for information, harshly interrogating, intimidating, and humiliating Plaintiff in hopes that he would incriminate himself or Mr. Miles.

37.     During the interrogation, Plaintiff was peppered with false accusations concerning his relationship with Mr. Miles.

38.     Officer Annarella frequently referred to Plaintiff and Mr. Miles as "the cash-money boys from Harlem," and accused Plaintiff of renting cars as part of an identity-theft ring involving Mr. Miles.

39.     At all times, Plaintiff answered the officers' questions openly and honestly, asserting that he and Mr. Miles were just friends who grew up in the same neighborhood, denying that they were engaged in criminal activity together.

40.     At one point during the interrogation, Officer Annarella and Detective Haverty asked Plaintiff to write a statement explaining how he knew Mr. Miles.  Plaintiff did so and afterward he heard Detective Haverty tell Officer Annarella, "The handwriting doesn't match."

41.     At another point during the interrogation, Officer Annarella and Detective Haverty showed Plaintiff photographs of the Swindler.  The photographs were still photographs taken from the Chase surveillance videos that recorded the Swindler as he was perpetrating fraudulent transactions the prior day at the three banks.  Asked if he recognized the Swindler, Plaintiff responded that he did not, to which Officer Annarella said incredulously, "You sure about that buddy?"

42.     Even after their wild-goose chase produced no incriminating information, Annarella and Haverty continued to confine Plaintiff and treat him like a bonafide suspect, disregarding his innocence, degrading him for no proper purpose.

43.     After the interrogation, Plaintiff was taken to a holding cell, where he began to feel sick.

44.     Not permitted to use the bathroom, Plaintiff became ill and vomited inside the holding cell, in response to which Officer Annarella threw a tissue at him and told him: "If you don't clean the vomit up, I'm going to clean it up with you."

45.     Around midnight, Plaintiff was transferred to another holding cell downstairs, where he remained for about eight hours.

46.     During this eight-hour period, Plaintiff was removed once from the cell to be fingerprinted and photographed, and to have his property vouchered, a cell phone and $740 cash.

47.     The proper procedure for vouchering rental cars is to voucher the car under the name of the registered owners or of the person renting the car, but in this case the individual defendants erroneously vouchered the Nissan, not to Plaintiff but to Mr. Miles, with whom Plaintiff had no contact during his confinement.

48.     Officer Annarella vouchered Plaintiff's cell phone and cash as "arrest evidence" under two Property Clerk Invoices (Invoice No. 1000091289 and No. 1000091291), signing both invoices at around 3:30 AM, on November 4, 2011.

49.     Defendant Sergeant David McQueen, who was in the 23rd Precinct supervising Officers Annarella and John Doe, also approved and signed both invoices at around 3:30 AM.

50.     Sergeant McQueen was aware of and furthered Plaintiff's unlawful confinement.  Knowing that there was no probable cause against Plaintiff, Sergeant McQueen nevertheless approved the unlawful arrest, interrogation, and confinement of Plaintiff; he also developed and approved the false and mendacious charges that would be filed against Plaintiff.

51.     At all times during Plaintiff's confinement, the individual defendants assisted each other in performing the various violations of Plaintiff's rights, and lent their physical presence and support to each other during the confinement.  At no point did any of them intervene or otherwise prevent their fellow officers from unlawfully confining, intimidating, harassing, and initiating malicious prosecution against Plaintiff.

52.     All the while, Plaintiff did not know what he was being charged with.  At around 5:00 AM, when Plaintiff asked what he was being charged with, Officer Annarella told him that he had a "warrant in Brooklyn."

53.     At around 8:00 AM – the morning of November 4, 2011 – Plaintiff was driven to Brooklyn (Kings County) Criminal Court.  In the car with him were Officer Annarella and Sergeant McQueen; another, unknown officer drove the car.

54.     At no time in the car or in the 23rd Precinct had Plaintiff said, done, or possessed anything illegal or incriminating.  And there was, in fact, no warrant in Brooklyn.

55.     Furthermore, at all moments of interacting with the police, Plaintiff did nothing suspicious and demonstrated no culpability; he behaved as an innocent person would, doing nothing "furtive," showing no consciousness of guilt.

56.     After being delivered to Central Booking of the Kings County Criminal Court, Plaintiff was photographed, searched, and interviewed in preparation for his arraignment – his arraignment on criminal charges submitted to the Kings County District Attorney's Office by the individual defendants.

57.     Officers Annarella and Sergeant McQueen were present during part of Plaintiff's processing at Central Booking.

58.     Plaintiff waited for about fourteen hours in the holding cells of the Criminal Court before he was arraigned.

59.     At around 11:00 PM, on November 4, 2011, Plaintiff was arraigned before Judge Evelyn Laporte in Kings County Criminal Court.

60.     At Plaintiff's arraignment, the Kings County District Attorney (the "D.A.") filed a felony complaint (the "Complaint") with the Court.

61.     As revealed in the Complaint, the prosecution against Plaintiff (The People of the State of New York versus Ramel Sanders, Docket 2011KN087847) was premised on the malicious fiction – concocted by the individual defendants – that he was the Swindler: that he went into three Brooklyn Chase branches on November 2, 2011, between 1:20 PM and 3:00 PM, and fraudulently withdrew $10,900.

62.     The Complaint charged Plaintiff with fourteen different crimes:  Grand Larceny in the third and fourth degrees, in violation of New York Penal Law §§ 155.35(1) and 155.30(1); Criminal Possession of Stolen Property in the third, fourth, and fifth degrees, PL §§ 165.50, 165.45(1), 165.40; Criminal Possession of a Forged Instrument in the second degree, PL § 170.25; Identity Theft in the first, second, and third degrees, PL §§ 190.80(1), 190.79(1), and 190.78(1); Falsifying Business Records in the first and second degrees, PL §§ 175.10 and 175.05(1); Petit Larceny, PL §155.25; and Unlawful Possession of Personal Identification Information, PL § 190.81.

63.     The Complaint was based solely on the sworn statement of Officer Annarella, who is referred to as the "deponent" in the Complaint and whose signature, under penalty of making a punishable false written statement (Class A misdemeanor, PL § 210.45), appears at the end of the Complaint.

64.     The Complaint states that the "source" and "grounds" of Officer Annarella's belief that Ramel Sanders committed the above-listed crimes are two individuals:  Scott McDonough, the Chase account-holder whose identity and funds were stolen by the Swindler; and Christina Cochran, the custodian of video surveillance records of Chase. The Complaint also states that "the surveillance cameras installed at the [Chase bank] locations taped the [Swindler's fraudulent] transactions."

65.    The central, fundamental lie of the prosecution comes in the third-to-last paragraph of the Complaint:  "The Deponent states that Christina Cochran provided the Deponent with the still pictures from the aforesaid surveillance video(s), and that the Deponent examined the pictures and observed defendant [Ramel Sanders] depicted in the pictures."  The prosecution against Plaintiff was based on this blatantly false identification made and alleged by Officer Annarella.

66.    The "still pictures" mentioned in the Complaint were the same photographs shown to Plaintiff in the interrogation room – photographs depicting the Swindler in the act of committing fraudulent transactions at the three Chase banks.

67.    Among the thousands of shots from various angles, including close-ups, that were taken of the Swindler at the Chase banks, not a single shot could be reasonably said to be Plaintiff.

68.    The surveillance images of the Swindler depicted a man who clearly was not the Plaintiff.  While the Swindler could reasonably be said to be a dark-skinned male (like Plaintiff), that's where the resemblance ends.  The two men had different facial structures and different facial hair

69.    To look upon the still photographs of the Swindler and conclude that they depict Plaintiff is to be senseless; no police officer acting in good faith would arrive at such a conclusion.

70.    Determined to initiate a criminal case against Plaintiff, determined to justify and perpetuate their unlawful conduct, the individual defendants remained willfully blind to the truth of Plaintiff's innocence.  The acts of the individual defendants during the arrest, detention, and the fabrication of criminal charges were deliberate, willful, reckless, wanton and malicious.

71.     In acquiring the still photographs from the Chase surveillance videos, the individual defendants consulted with Christina Cochran ("Ms. Cochran") of JPMorgan Chase Bank, Global Securities and Investigations.

72.     Ms. Cochran provided the individual defendants with black-and-white still photographs from the relevant Chase branches.

73.     Ms. Cochran fully cooperated with the NYPD during the investigation of identity theft at the three Chase branches, and did nothing to impede the investigation. She clearly expressed the willingness and ability to assist the NYPD.

74.     Ms. Cochran was able to provide not only black-and-white photographs but also surveillance videos in color showing the Swindler.

75.     The individual defendants were aware of the surveillance videos and could have easily acquired them, but they deliberately chose not to do so.

76.     The individual defendants hastily and blindly jumped to a false conclusion about Plaintiff's guilt, conducting a rushed, incomplete, and sloppy investigation, exercising weak and shoddy judgment.

77.     At Plaintiff's arraignment, the D.A. requested an order of protection against Plaintiff on behalf of Scott McDonough, the victim of the identity fraud.  Judge Laporte issued this order of protection.

78.     The D.A. also requested bail to be set in the amount of $10,000.  Judge Laporte decided to release Plaintiff on his own recognizance, ending about thirty hours of unjustified captivity.

79.     Judge Laporte adjourned the case to January 11, 2012, for "Grand Jury Action," requiring Plaintiff to go to New York State Supreme Court – at 320 Jay Street in Brooklyn – on that day.

80.     In Supreme Court on January 11, 2012, the D.A. announced that there was "no grand jury action" against Plaintiff.  Judge Desmond Green extended the order of protection and adjourned the case to February 23, 2012.

81.     Through his attorney, Plaintiff sent the Assistant District Attorney prosecuting his case – A.D.A. Brandon Smith ("ADA Smith") – numerous photographs of himself, so that ADA Smith could compare Plaintiff to the Swindler depicted in the Chase surveillance videos.

82.     After ADA Smith viewed the photographs of Plaintiff and determined that Plaintiff was not in fact the Swindler, he advanced the case to drop all charges against Plaintiff.

83.     On January 18, 2012, all criminal charges under docket 2011KN087847 were dismissed and sealed.

84.     Despite the certainty with which Mr. Miles was deemed by the individual defendants to be an identity-theft ring-leader and toxic associate of Plaintiff, the prosecution against Mr. Miles – Docket 2011NY079629, wherein Mr. Miles was charged (in Manhattan) with criminal possession of a stolen credit card, unlawful possession of personal identification information, and unauthorized use of a vehicle – was dismissed on August 6, 2012 pursuant to Criminal Procedure Law § 30.30; Mr. Miles' case was never even presented to the grand jury.

85.     Due to his unlawful arrest, interrogation, and captivity, Plaintiff suffered humiliation, fear, and anguish.

86.     Due to his prosecution based on maliciously fabricated charges, Plaintiff suffered extreme emotional and mental distress, feeling increasingly anxious, depressed, and isolated from his family.

87.     After the criminal charges were dismissed, Plaintiff spent many hours trying to retrieve his vouchered property, and for over a month, went through a time-consuming ordeal of trying to secure the return of the Nissan, which was impounded at Erie Basin Pound, an ordeal exacerbated by the fact that the individual defendants mis-vouchered the Nissan.

88.     The NYPD failed to supervise and discipline Officer Annarella and Sergeant McQueen despite their long histories of malicious and mendacious behavior.

89.     Prior to November 2011, Annarella had exhibited a pattern of misconduct and abuse of power, involving reckless, malicious, and deceitful behavior, for which he had not been appropriately supervised or disciplined.

90.     Officer Annarella has a substantial history of making arrests without probable cause and fabricating criminal charges against innocent citizens, among other forms of misconduct.

91.     In 2010 alone, Officer Annarella was named as defendant in two civil rights lawsuits in the Southern District of New York:  10-CV-3170, <u>Acevedo v. The City of New York et al</u>.; and 10-CV-5171, <u>Taylor v. City of New York et al</u>.  In <u>Acevedo</u>, Annarella was alleged to have assaulted, arrested, and initiated prosecution against plaintiff Acevedo upon a deliberately fabricated claim; this case settled for $40,000.  In <u>Taylor</u>, Annarella was alleged to have falsely arrested and maliciously charged plaintiff Taylor with drug charges; this case settled for $17,500.

92.     Upon information and belief, other serious complaints have been lodged against Officer Annarella, illustrating a larger pattern of misconduct.

93.     Sergeant McQueen has a disturbing and considerable history of misconduct involving dishonest and rogue behavior – behavior that should have alarmed the NYPD,

behavior sufficiently dangerous, consistent, and continuous to indicate a threat to the security and liberty of New Yorkers.

94.     In response to the many serious complaints made against Annarella and McQueen, the NYPD failed to properly investigate, adjudicate, and impose discipline, ignoring the risk that they would engage in future misconduct, thereby encouraging them to continue to violate the rights of civilians, and emboldening them to abuse their powers.

95.     The NYPD's flaccid response to lying officers – particularly in the context of filing false charges – constitutes an irrational custom and policy that fosters a culture of mendacity in the NYPD.

96.     There is a systemic failure to identify, discipline, and supervise NYPD officers with propensities to fabricate charges, a failure so widespread, obvious, and tolerated as to constitute a custom and policy of Defendant City.

97.     Defendant City enforces, promotes, authorizes, and sanctions the NYPD's customs and practices of failing to adequately investigate and address allegations of officer mendacity in the creation of criminal charges.  Such mendacity encompasses the wrongs of perjury, making official false statements, and preparing false reports.

98.     To the wrongdoing of officer fabrication in the context of filing criminal complaints – Defendant City has turned a blind eye, a blindness that constitutes deliberate indifference.  The excellence with which the NYPD monitors and regulates, say, officers' use of a firearm, highlights its woeful inadequacy in monitoring and regulating officer integrity and mendacity in the filing of criminal charges.

99.     When it comes to supervising and disciplining officers, the NYPD fails to adequately consider allegations lodged against officers in Civil Rights lawsuits, routinely ignoring lawsuits that are settled for relatively small amounts (e.g. $17,500, $40,000)

even though such lawsuits may reveal a broader pattern of misconduct by a police officer. In doing so, the NYPD frequently overlooks serious allegations of officer mendacity.

100.    One feature of Defendant City's policy and custom is the absence of a serious policy and custom:  there is no serious mechanism in place by which to effectively identify and weed out dishonest officers, even when their mendacious behavior abrogates the constitutional rights of citizens.

101.    In 1995, by Executive Order No. 18, Defendant City's Mayor created the Commission to Combat Police Corruption (the "Commission") to monitor and evaluate the NYPD's anti-corruption activities.

102.    The Commission fulfills its mandate to monitor the NYPD's performance by reviewing the investigations of the Internal Affairs Bureau ("IAB"), and presenting its findings in its Annual Report.

103.    Since its inception, the Commission has emphasized the importance of appropriately disciplining officers who make false statements.  On the basis of the Commission's recommendations, the NYPD's has adopted a False Statement Policy that mandates termination of officers who intentionally make false official statements regarding a material matter, unless exceptional circumstances exist.

104.    In its Annual Reports, the Commission has found that the NYPD "failed to charge the subject officer with making a false statement although such a charge appeared appropriate" (2006 Annual Report).  The Commission has "believed that often other similar charges were levied instead to avoid the imposition of the False Statement Policy's requirement of termination" (2008 Annual Report).  In addition, "[a]s the False Statement Policy was increasingly upheld, the Commission found an increase in the

finding of exceptional circumstances to justify a penalty that did not result in termination" (2008 Annual Report).

105.     In the 2009 Annual Report, three cases were studied where police officers signed criminal court documents under penalty of perjury which contained falsehoods – but rather than face the penalty of termination, the officers each lost thirty vacation days. The Commission stated in the Report that the NYPD "failed to follow its false statement policy."

106.     In the 2010 Annual Report, the Commission identified only ten IAB cases that included allegations of making an official false statement.

107.     In the 2011 Annual Report, the number of IAB cases where it appeared the subject officer made an official false statement was nineteen.  Of these, seven cases involved false statements in court documents (supporting depositions, criminal court complaints, and affidavits).  None of those seven cases resulted in the subject officer's separation from the NYPD.

108.     In the 2012 Annual Report, there were only eleven IAB cases involving an official false statement subject to the NYPD's False Statement Policy.  Four of these cases involved court documents, and in none of those four cases was the subject officer separated from the NYPD.  This Annual Report continued to find instances where officers were too lightly punished for making false statements.  The Commission also found seven cases involving false statements in court documents where the subject officers should have been charged with making a false official statement but were not.

109.     The 2012 Annual Report states:  "It is important to have consistency in the application of the False Statement policy, from the charges brought to the penalties imposed.  Consistency enables members of the Department to know what they can expect

when they make false official statements and helps ensure the deterrent effect that was originally intended" (page 45).

110.    Proportionate and appropriate discipline sends a message to NYPD officers that they are not above the law and are accountable to the people whom they serve.  But for making false statements on court documents, NYPD officers often face only minor discipline or no discipline whatsoever.

111.    The number of false statement cases investigated by the IAB in the context of court documents is a very small portion of the actual number of instances of material fabrication in court documents, particularly criminal court complaints, for most of these instances go unreported.

112.    The Civilian Complaint Review Board ("CCRB") has no jurisdiction to investigate allegations of fabricated statements by NYPD officers in criminal court documents.  Investigating, controlling, and punishing this type of wrongdoing is the responsibility of the NYPD.

113.    The inadequacy of NYPD's supervision and discipline with respect to dishonesty in the filing of criminal charges is exacerbated by the pressure on police officers to meet arrest quotas, or "performance goals," which pressure officers to arrest people and file charges unlawfully, a pressure not tempered by adequate safeguards that ensure citizens are not being wrongfully arrested and charged.

114.    On October 17, 2011, NYPD Commissioner Raymond Kelly directed the release of Operations Order No. 52, which mandates that "Department managers can and must set performance goals" related to issuing summons, questioning suspicious individuals, and arresting criminals.

115.     Because arrests are rewarded, while making false arrests and fabricating charges go largely unpunished, police officers have felt incentivized to engage in false arrests and to fabricate criminal charges; such perverse incentives become particularly destructive in the hands of undisciplined, unsupervised officers.

116.     Beyond recognizing the formal complaints that are made against NYPD officers, Defendant City does not actively monitor or report the filing of false or fabricated charges.

117.     For example, Defendant City has failed to adequately inquire into the tens of thousands of criminal cases which are dismissed each year in the Criminal and Supreme Courts of Defendant City; has failed to study how many of those dismissals were due to baseless, fabricated charges; has failed to proactively look for patterns of fabrication and identify charges that should have never been brought.

118.     In a criminal justice system where numbers and statistics have become paramount, the temptation by officers and precincts to cheat and manipulate numbers has been under-recognized by Defendant City.  The discrepancy between the official policy of integrity and the actual practices of mendacity is a discrepancy Defendant City has failed to address in more than conclusory fashion.

119.     Despite well-publicized and recent events that underscore the problems of officer dishonesty (Adrian Schoolcraft, ticket-fixing, and a secret quota system, to name a few), the issue of officer dishonesty in the particularly-important context of filing criminal charges has been largely overlooked.

120.     Through the data cited herein along with other information in its possession, the policymakers of Defendant City have been aware of the NYPD's practice of insufficiently punishing – and thereby encouraging – the filing of fabricated criminal

charges; by doing nothing about this practice, the City has demonstrated deliberate indifference to the rights of its citizens.

121.     As a direct and proximate cause of the said acts of the Defendants, Plaintiff suffered the following injuries and damages:

        a.  Violation of his constitutional rights under the Fourth Amendment to the United States Constitution;

        b.  Severe emotional trauma, distress, degradation, and suffering;

        c.  Loss of income and income potential.

## SECTION 1983 CLAIMS

## FIRST CLAIM

### Deprivation of Federal Civil Rights Under Section 1983

122.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

123.     All of the aforementioned acts of Defendants, their agents, servants and employees, were carried out under the color of state law.

124.     All of the aforementioned acts deprived Plaintiff of the rights guaranteed to citizens of the United States by the Fourth Amendment to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

125.     The individual defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth Amendment of the United States Constitution.

126.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged .

## SECOND CLAIM

### False Arrest Under Section 1983

127.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

128.     By the actions described above, Defendants deprived Plaintiff of his federal civil rights, including his Fourth Amendment right to be secure in his person against unreasonable searches and seizures, specifically his right to be free of false arrest.

129.     As detailed above, the individual defendants intentionally arrested and detained Plaintiff without probable cause, without a warrant, without privilege or consent.

130.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged .

## THIRD CLAIM

### Malicious Prosecution Under Section 1983

131.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

132.     By the actions described, the Defendants deprived Plaintiff of his Fourth Amendment right to be free of unreasonable or unwarranted restraints on personal liberty, specifically his right to be free from malicious prosecution.

133.     Without probable cause, the individual defendants directly and actively initiated a criminal proceeding against Plaintiff, collectively creating a fraudulent theory of guilt, providing a mendacious felony complaint to the D.A., alleging an overtly false identification of Plaintiff.

134.     In commencing a felony prosecution against Plaintiff, the individual defendants acted with actual malice, with reckless disregard for Plaintiff's innocence,

deliberately fabricating charges against Plaintiff, intentionally misleading the D.A., doing so not to bring an offender to justice but to degrade Plaintiff, and to falsely justify and perpetuate their unlawful conduct.

135.    As a result of the malicious prosecution, Plaintiff was ordered, under threat of warrant and arrest, to return to court, and Plaintiff had an order of protection issued against him.

136.    The criminal proceeding terminated in Plaintiff's favor when all charges against him were dismissed.

137.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged .

## FOURTH CLAIM

### Failure to Intervene Under Section 1983

138.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

139.    Each and every individual defendant had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights by other law enforcement officers.

140.    The individual defendants failed to intervene on Plaintiff's behalf to prevent, end, or truthfully report the violations of his constitutional rights despite knowing about such violations and having had a realistic opportunity to do so.

141.    As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged .

## FIFTH CLAIM

### Municipal Liability Under Section 1983

142.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

143.     By the actions described, the Defendant City deprived Plaintiff of his Fourth Amendment right to be free of false arrest and malicious prosecution through its official policy and custom of having weak disciplinary measures for NYPD officers who have histories and propensities of fabricating criminal charges; a policy and custom of systematically ignoring credible doubts about police officers' integrity, thereby fostering a culture of dishonesty among those who wield considerable power over the lives of everyday citizens; a policy and custom of failing to adequately investigate and punish dishonesty in the creation and initiation of criminal charges, which encourages unscrupulous officers to deprive citizens of rights and to lie about it.

144.     By failing to seriously investigate and truly assess Officer Annarella's history of fabricating charges, among other abuses of power, and by failing to appropriately supervise and discipline him, the NYPD tacitly endorsed his reprehensible and disordered behavior, empowering him to continue such behavior.

145.     By failing to seriously investigate and truly assess Sergeant McQueen's history of dishonesty and rogue behavior, and by failing to appropriately supervise him and discipline him, the NYPD tacitly endorsed his reprehensible and disordered behavior, empowering him to continue such behavior.

146.     By continuing to allow Officer Annarella and Sergeant McQueen – and other potentially malicious, dishonest, rogue officers – the power to, among other things, carry a gun, make arrests, and initiate criminal charges against New Yorkers, the Defendant City has exhibited deliberate indifference to the safety, well-being, and rights of New Yorkers.

147.     By tolerating weak and ineffectual means of supervising, regulating, sanctioning, disciplining, and monitoring malicious and mendacious officers, Defendant City has intentionally disregarded the constitutional rights of New Yorkers.

148.     As a direct and proximate result of the acts of Defendant City, Plaintiff sustained the other damages and injuries hereinbefore alleged .

## PENDENT STATE CLAIMS

### FIRST CLAIM

**False Imprisonment under N.Y. State Law**

149.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

150.     The individual defendants intentionally arrested and detained Plaintiff without probable cause, without a warrant, and without privilege or consent.

151.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged .

### SECOND CLAIM

**Malicious Prosecution Under N.Y. State Law**

152.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

153.     As detailed above, the individual defendants intentionally and with actual malice initiated a felony prosecution against Plaintiff without probable cause.

154.     The prosecution terminated in Plaintiff's favor when the D.A. dismissed all charges against him.

155.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged .

## THIRD CLAIM

**Unreasonable Search and Seizure Under New York State Constitution Art. I § 12**

156.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

157.     Article 1, Section 12, of the New York State Constitution declares the right to be free from unreasonable searches and seizures.

158.     Without probable cause and without Plaintiff's consent, the individual defendants arrested Plaintiff, searched his person, took his property, confined him, and initiated false charges against him.

159.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged .

## FOURTH CLAIM

**Negligent Hiring/Training/Retention of Employment Services Under N.Y. State Law (Against Defendant City of New York)**

160.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

161.     Defendant City owed a duty of care to Plaintiff to prevent the false arrest, malicious prosecution, and mental and emotional abuse sustained by Plaintiff.

162.     Upon information and belief, all of the individual defendants were unfit and incompetent for their positions.

163.    Defendant City knew or should have known through the exercise of reasonable diligence that the individual defendants could potentially cause harm.

164.    Defendant City's negligence in hiring, screening, training, disciplining and retaining the individual defendants proximately caused Plaintiff's injuries.

165.    Defendant City knew or should have known of both Officer Annarella and Sergeant McQueen's histories of heinous misconduct.

166.    As a result of its negligent conduct, Defendant City has directly and proximately caused the damages and injuries hereinbefore alleged.

## FIFTH CLAIM

### Respondeat Superior Under N.Y. State Law

167.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

168.    Defendant City is the employer of the individual defendants.

169.    Under the doctrine of *respondeat superior*, the Defendant City is responsible for the wrongdoing of its employees acting within the scope of their employment – in this case, the false imprisonment, malicious prosecution, and unreasonable search and seizure committed by the individual defendants against Plaintiff.

170.    As a direct and proximate result of the acts of the individual defendants detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands the following relief jointly and severally against the Defendants:

a.      An order awarding compensatory damages for Plaintiff Ramel

Sanders in an amount to be determined at trial;

b.      An order awarding punitive damages in an amount to be

determined at trial;

c.      A court order, pursuant to 42 U.S.C. § 1988, that Plaintiff is

entitled to reasonable attorney's fees, costs and disbursements; and

d.      Such other and further relief as this Court may deem appropriate.


DATED:      May 13, 2013                    _____s/_____
            New York, New York             CYRUS JOUBIN, ESQ.
                                            317 Lenox Avenue, 10th Fl.
                                            New York, NY 10027
                                            (703) 851-2467
                                            joubinlaw@gmail.com
                                            Attorney for Ramel Sanders